UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

WILLIAM MULLER,

                              Petitioner,

                                                          9:13-cv-00775
v.
                                                          (GTS/TWD)

WILLIAM LEE,

                              Respondent.
_____

APPEARANCES:                                  OF COUNSEL:

LAW OFFICES OF JOEL B. RUDIN                   JOEL B. RUDIN, ESQ.
Attorney for Petitioner
600 Fifth Avenue, 10th Floor
New York, New York 10020


HON. ERIC T. SCHNEIDERMAN                      ALYSON J. GILL, ESQ.
Attorney General of the State of New York      Assistant Attorney General
Attorney for Respondent                        Of Counsel
120 Broadway
New York, New York 10271


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge


## <u>REPORT AND RECOMMENDATION</u>

       This matter has been referred to the undersigned for Report and Recommendation,

pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3(c), by the

Honorable Glenn T. Suddaby, Chief United States District Judge.  Presently before this Court is

the timely counseled petition of Petitioner William Muller, seeking a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  (Dkt. No. 1.)

# I.    INTRODUCTION

Petitioner challenges a judgment of conviction entered on June 19, 2007, following a jury trial in Columbia County Supreme Court ("County Court"), the Honorable Jonathan D. Nichols, County Court Judge, presiding.  (Dkt. No. 23-1 at 156-57.)  Petitioner was convicted of two counts of murder in the first degree (New York Penal Law § 125.27(1)(viii)).  Petitioner was sentenced to life imprisonment without parole on each count, to be served concurrently.  (Dkt. No. 13-1 at 63.)

The Appellate Division Third Department ("Appellate Division") unanimously affirmed the judgment of conviction on April 22, 2010, and leave to appeal to the New York Court of Appeals was denied on June 20, 2010.  *People v. Muller*, 899 N.Y.S.2d 425 (3d Dep't 2010), *lv. denied*, 899 N.Y.S.2d 425 (Table) (2010).

On July 20, 2012, the County Court denied Petitioner's motion to vacate his conviction pursuant to CPL § 440.10 (Dkt. No. 17-3 at 2-14), and leave to appeal that ruling was denied by the Appellate Division on September 27, 2012.  (Dkt. No. 1-2 at 2.)  Petitioner's writ of error *coram nobis* was denied by the Appellate Division on December 21, 2012 (Dkt. No. 18-2 at 2), and the New York Court of Appeals denied leave to appeal on June 27, 2013.  (Dkt. No. 18-3 at 2).

On Petitioner's direct appeal, the Appellate Division briefly summarized the facts of this case:

> On the night of June 27, 2006, defendant went to the home of his in-laws armed with a loaded pump-action shotgun looking for his estranged wife [Christie Muller].  After he arrived at the premises, defendant was confronted by [Dennis] Lynch and, moments later, three shots were discharged from the shotgun mortally wounding [Dennis] Lynch and his wife [Carolyn Lynch].  What transpired immediately prior to and at the time of the shooting was the subject of dramatically different testimony given at trial by defendant and

his estranged wife. Defendant denied harboring any ill will toward his in-laws and claims that he went to their home to commit suicide in front of his wife who was seeking a divorce. He admits being armed with a loaded shotgun, but claims that the weapon accidentally discharged three times during a physical struggle that he had with [Dennis] Lynch shortly after he arrived at the premises. Defendant's wife, who was present in the home at the time of the shootings, claims that defendant came to her parents' home intending to kill her and, while there, executed her two parents when they sought to intervene on her behalf.

*People v. Muller*, 899 N.Y.S.2d at 428.

Petitioner raises the following grounds for habeas relief:

(1) The County Court's violation of Petitioner's Fifth, Sixth, and Fourteenth Amendment rights to present a defense and to due process of law by barring Petitioner from raising the defense of extreme emotional disturbance and from introducing evidence of his prior suicide attempts in support of his defense of lack of specific intent and of accident (Dkt. No. 1 at 16);

(2) Ineffective assistance of trial counsel in violation of Petitioner's rights under the Sixth Amendment, *id*.;

(3) Ineffective assistance of appellate counsel in violation of Petitioner's right under the Sixth Amendment, *id*. at 17;

(4) The County court's violation of Petitioner's Sixth Amendment right to confrontation by improperly restricting the cross-examination of Petitioner's estranged wife at trial; *id*.; and

(5) The People's suppression of *Brady* material supporting Petitioner's defense, and its misleading summation in violation of Petitioner's right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments. *Id*. at 17-18.

Respondent has filed an answer, together with the pertinent state courts records and a memorandum of law in opposition to the petition. (Dkt. Nos. 11, 13-23.) Petitioner has filed a reply. (Dkt. No. 28.) With permission of this Court, Respondent has filed a sur-reply. (Dkt. No. 36.) The Court has fully considered the submissions, including letter briefs (Dkt. No. 38 and 39), and arguments of the parties. For reasons explained herein, the Court recommends the habeas petition be denied and dismissed in its entirety.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.     Relevant Pre-Trial Matters

On September 6, 2006, Petitioner was indicted on charges of murder in the first degree for the deaths of Dennis Lynch and Carolyn Lynch, the parents of his estranged wife, on June 27, 2006.  (Dkt. No. 13-1at 67-68.)  On September 19, 2006, Petitioner, represented by William M. Tendy, Esq. ("Tendy"), entered a plea of not guilty.  (Dkt. No. 19-1 at 1-10.)

On October 17, 2006, Tendy filed a notice of intent to present psychiatric evidence pursuant to CPL § 250.10.  (Dkt. No. 36-2 at 3-4.)  However, that notice merely mirrored CPL § 250.10, and by letters dated November 13, 2006, and November 20, 2006, the People advised Petitioner the notice was defective and requested, in accordance with *People v. Almonor*, 693 N.Y.S.2d 861 (1999), "more specificity as to the type of psychiatric evidence" the defense intended to offer at trial.  (Dkt. No. 36-2 at 7, 9.)

By letter dated November 22, 2006, Tendy disputed the People's claim of defective CPL § 250.10 notice, stating the notice was timely served and filed within thirty days of Petitioner's plea.  (Dkt. No. 36-2 at 11.)  Tendy further stated because Petitioner had not yet been examined by a psychiatrist, he was unable to provide additional information.  *Id.*  Tendy claimed "there would be no last minute surprise regarding psychiatric evidence," and that an amended notice would be provided "as it becomes available and necessary."  (Dkt. No. 36-2 at 11-12.)

On December 26, 2006, Marco Caviglia, Esq. ("Caviglia"), entered an appearance on Petitioner's behalf.  (Dkt. No. 36-2 at 16.).  On January 2, 2007, Caviglia requested adjournment of the January 8, 2007, pretrial hearing, and January 22, 2007, trial.  (Dkt. No. 36-2 at 19-20.)

Caviglia indicated he needed time to review Petitioner's case file and to address some outstanding issues, "such as perfection of the notice of intent to introduce a psychiatric defense, and some disclosure issues." (Dkt. No. 36-2 at 19-20.)

On January 8, 2007, the People moved to preclude "any evidence as set forth in CPL § 250.10 because of [Petitioner's] defective and inadequate notice as well as his failure to provide discovery pursuant to CPL 240.30." (Dkt. No. 36-2 at 24.) The County Court entertained the People's order to show cause on January 8, 2007. *Id.* at 25. There, Caviglia stated that he intended to perfect the CPL § 250.10 notice, but had not had time to fully review the case file, nor identify a psychiatric expert. (Dkt. No. 36-2 at 25-30, 32.) Based in part on that representation, the County Court denied the People's motion without prejudice. *Id.* at 30[1]. The pretrial hearing was adjourned to March 5, 2007. *Id.* at 31.

By letter dated January 19, 2007, the People renewed their request that Petitioner comply with the notice requirements of CPL § 250.10, specifically requesting notice of the type of psychiatric evidence the defense intended to present at trial. (Dkt. No. 36-2 at 34.) Caviglia responded to the People's request by later dated January 23, 2007, and indicated that was still in the process of attempting to obtain a mental health expert. *Id.* at 36.

By letter dated January 30, 2007, the People requested an amended CPL§ 250.10 notice that was "sufficiently specific" by February 2, 2007, and that Petitioner forward "any hospital

---

[1] During the January 8, 2007, hearing, Caviglia further stated, "Your Honor, I have not identified a particular expert at this time. I realize that – I am sure The Court appreciates the fact that there's logistical issues involved in terms of availability of the expert, and I will do the best I can to determine first if we should be approaching that particular type of affirmative defense, and if so identifying an expert and seeing how quickly he or she can work with us and produce the report for the prosecution as rapidly as possible." (Dkt. No. 36-2 at 32.)

records, medical records, counseling records, notes, statements, psychiatric material . . .which may be utilized as the basis for your defense as previously demanded[.]" *Id*. at 38.

On February 7, 2007, Caviglia provided supplemental notice, pursuant to CPL § 250.10(b), that he "shall present lay witness evidence only concerning the affirmative defense of extreme emotional disturbance." (Dkt. No. 36-2 at 41.) Caviglia also indicated the supplemental notice was "served purely for the purpose of avoiding surprise to the People, although in the absence of psychiatric evidence to be presented, it is the [Petitioner's] position that such notice is not required." *Id*.

Thereafter, the People moved for an order to show cause on February 23, 2007, "why an order of preclusion should not be entered against [Petitioner] from introducing into evidence any and all testimony concerning the affirmative defense of extreme emotional disturbance and any other related evidence, due to [Petitioner's] defective and inadequate Notice of Intention" pursuant to CPL § 250.10. (Dkt. No. 36-2 at 44.)

In response, Caviglia submitted an answer and memorandum of law, dated February 23, 2007. *Id*. at 46-51. That answer revealed for the first time Petitioner would present evidence of his past suicide attempts and depression in support of the affirmative defense. *Id*. at 46. Specifically, on April 15, 2006, Petitioner was transported by the New York State Police to Columbia Memorial Hospital pursuant to a complaint by his wife that he was threatening suicide with a gun. *Id*. at 46. The next day, he was transferred to Ellis Hospital and was diagnosed with depression and suicidality. *Id*. He was prescribed Tofranil, a tricyclic antidepressant. *Id*. On April 19, 2007, Petitioner was discharged from Ellis Hospital. *Id*. Caviglia claimed that based upon information and belief, Petitioner attempted suicide on at least one more occasion prior to

the shootings.  *Id.*  Caviglia claimed all of this information was known to the police and to Petitioner's wife.  *Id.*

In addition, Caviglia responded he provided proper supplemental notice under CPL § 250.10 that Petitioner would only present lay witness testimony at trial in support of the defense. *Id.* at 51.  Caviglia further argued that "when a lay witness establishes a mental status defense, the defendant's right against self-incrimination is not waived, because the non-expert is not testifying to matters that the defendant related verbally to the lay witness, but is relating the witness' observation.  *Id.* at 48.

Caviglia further argued:

> None of the cases cited by the People supports their contention that regardless of an absence of a showing of prejudice by the People, they are entitled to a *per se* preclusion of defendant's affirmative defense for [extreme emotional disturbance].  The defense is clear and unambiguous.  No expert is proffered by the defense on its direct case, if any.  Only lay witness testimony, largely the People's own witnesses are anticipated as the witnesses establishing the basis for [extreme emotional disturbance] who shall be used for such purposes.  There is no surprise or inadequate means to prepare for the [extreme emotional disturbance] defense on the part of the People.  There is no right under these circumstances of the People to unilaterally examine the defendant in violation of his right to silence pursuant to the Fifth Amendment and the Constitution of the State of New York.  The defendant is entitled to pursue [extreme emotional disturbance] sufficient notice having been provided, assuming any under these circumstances is required.

*Id.* at 50-51.  The County Court disagreed.  (Dkt. No. 36-2 at 54.[2])

---

[2]  Judge Nichols saw "no distinction in the statutory provision or any case law that distinguishes lay testimony from psychiatric evidence as defined under [§] 250.10 of the CPL."  (Dkt. No. 36-2 at 54.)  Time proved Judge Nichols' ruling was correct.  In 2010, the New York Court of Appeals addressed the issue that it had left open in *People v. Smith*, 776 N.Y.S.2d 198 (2004), and held that a defendant seeking to raise an extreme emotional disturbance defense is required to provide notice pursuant to CPL § 250.10 even "if the intent is to rely solely on lay testimony to prove the affirmative defense."  *People v. Diaz*, 904 N.Y.S.2d 343, 345 (2010).

The County Court found Petitioner's supplemental CPL § 250.10 notice was insufficient "on its face," in that it did not provide any "general parameters or description of the defense that was going to be asserted." *Id*. at 55. However, the County Court found that "the supplemental notice together with today's . . . further augmentation on the record as the general parameters [was] sufficient notice for the extreme emotional disturbance defense within those parameters." *Id*. at 56. The County Court also held that the People were entitled to subject Petitioner to an examination under CPL § 250.10(3). *Id*. In addition, "given the relative proximity to trial," County Court would permit any prosecution expert to "sit through the testimony of any lay witnesses that gives information as to this asserted defense, . . . putting the People on . . . even footing in being able to reply to that defense in the same context as if there had been an expert retained by the defense." *Id*. at 56-57.

Consequently, at the People's request, and over Petitioner's objection, the Court ordered Petitioner to serve proper written notice pursuant to CPL §250.10 by February 28, 2007, and further held that upon motion, the People were entitled to a court-ordered psychiatric evaluation of Petitioner. *Id*. Caviglia noted his exception to County Court's ruling that the People were entitled to a psychiatric examination of Petitioner. *Id*. at 61.

Thereafter, upon motion by the People, on February 26, 2007, pursuant to CPL § 250.10(3), County Court ordered Petitioner to "submit to an examination by a psychiatrist or licensed psychologist designated by the District Attorney at the Columbia County jail on Friday, March 2, 2007[.]" *Id*. at 71.

However, by letter dated March 1, 2007, Caviglia advised the People and County Court that after conferring with Petitioner, Petitioner declined to undergo the psychiatric examination

scheduled the next day. *Id*. at 73[3]. In response, County Court directed Petitioner to submit to the

psychiatric evaluation in accordance with the February 26, 2007, order. *Id*. at 75. Nevertheless,

the following day, when the People's psychiatrist arrived to examine Petitioner, Petitioner

refused, stating his attorney advised him not to speak with anyone. *Id*. at 77.

Consequently, on March 5, 2007, the People moved for an order to show cause why

Petitioner should not be precluded from presenting evidence of his psychiatric defense, including

"1) introducing into evidence any and all expert psychiatric testimony and/or psychiatric

evidence, 2) precluding lay witness testimony which refers to psychiatric treatment or psychiatric

or medical diagnostic terminology, and 3) precluding lay witness testimony in support of the

affirmative defense of extreme emotional disturbance, due to [Petitioner's] defective and

inadequate Notice of Intention to Present Psychiatric Evidence pursuant to CPL [§] 250.10[.]"

*Id*. at 80.

At the March 5, 2007, hearing, Caviglia confirmed that he did not serve further notice

pursuant to CPL § 250.10 and Petitioner did not submit to the psychiatric examination. *Id*. at 83.

Caviglia explained:

> Your Honor, I confirmed with my client on Thursday that we
> would not be proceeding with that examination[.] . . . My client
> was made aware that if he did not proceed that he suffered pain of
> preclusion regarding the [extreme emotion disturbance defense],
> and my client made his decision accordingly[.] . . . And it appears
> that [the extreme emotional disturbance defense] issue is being
> resolved as I surmised it might be.

(Dkt. No. 36-2 at 89-90.)

---

[3] In that letter, Caviglia also expressed his disagreement with the County Court's prior ruling on
this matter, given that the accused would rely solely on the layperson testimony. *Id*. at 73.

Because Petitioner refused to submit to the psychiatric evaluation by the People's psychiatrist, failed to provide Petitioner's psychiatric records, and failed to submit a new CPL § 250.10 notice, the County Court granted the People's motion, and thus, precluded the defense "from submitting any proof as to any basis of an affirmative defense of extreme emotional disturbance . . . at the time of trial" *Id*. at 89.

**B.    The Trial**

1.    <u>The Incident</u>

Christie Lynch Muller ("Christie"), Petitioner's estranged wife, testified that on June 27, 2006, she and her two-year old son, MM, were living with her parents, Dennis and Carolyn Lynch.  (Dkt. No. 20 at 58.)  That evening, Petitioner called Christie and the two argued over the telephone.  *Id*. at 62.  Petitioner told Christine she was a bad mother, he was going to take MM from her, and she would never see MM again.  *Id*. at 63.  Christie told Petitioner not to call and fight with her.  *Id*.  At approximately 11:00 p.m. on June 27, 2006, after her parents had gone to bed and while putting on a video for MM to watch in the first floor bedroom they were sharing, Christie heard a noise toward the back of the wall by the window.  *Id*. at 64-65.  She turned off the television and asked, "Billy, is that you?"  *Id*. at 65.  Petitioner responded, "Yes.  I am going to fucking kill you."  *Id*.

Christie ran out of her bedroom and called to her father, who ran down the stairs and told her to go back inside her bedroom.  *Id*. at 65-66.  Petitioner entered the house through the side window or side door.  *Id*. at 66.  He was dressed in black jeans, black boots, a camouflage jacket, a black baseball cap, and gloves.  *Id*. at 71, 116.  Christie ran back into her bedroom and locked the door.  *Id*. at 66.  She tried to call the police from the landline telephone but there was no dial tone; she looked for her cellular phone but could not find it.  *Id*. at 66, 96.

Christie heard two gunshots. *Id*. at 66. She came out of her bedroom, and called out for father. *Id*. He did not respond. *Id*. Christie returned to her bedroom. *Id*. She cracked open the door and peaked out. She saw Petitioner standing in the living room holding a shotgun. *Id*. She heard her mother pleading with Petitioner, saying, "Billy, please don't do this. Don't kill Dennis. Don't hurt him." *Id*. at 66-67. Petitioner responded, "I already did. I shot him. He's dead." *Id*. at 67. Christie shut the bedroom door. *Id*. She heard her mother scream, "Please don't do this," followed by another gunshot. *Id*.

Moments later, Petitioner broke into her bedroom. *Id*. at 67. He was holding the shotgun. *Id*. Christie was in the corner of her bedroom holding MM. *Id*. Petitioner told Christie, "I killed your mom and dad. They're dead." *Id*.

Petitioner grabbed Christie and led her into the kitchen. *Id*. Christie fell to the floor in front of the kitchen sink. *Id*. She was still holding MM. *Id*. Petitioner again told Christie that he killed her parents, and that she was next. *Id*. at 67-68.

Christie asked, "why did you do this?" *Id*. at 68. Petitioner responded, "I had to. You hurt me. Now you're going to be hurt." *Id*. at 68. Petitioner instructed Christie to take the gun and to shoot herself. *Id*. Christie pleaded for her life and MM's welfare. *Id*. Petitioner said to Christie, "I have to kill you . . . you know I have to kill you." *Id*. MM was crying. *Id*. Petitioner said, "make him stop crying. Tell him to stop crying." Christie attempted to soothe MM. MM then said, "Daddy, just please leave. Please go." *Id*. at 69. Christie then said to Petitioner, "Look at what you did to your son. You killed his Pappy and Grammy." *Id*.

Christie testified that Petitioner then told MM that he killed his Grammy and Pappy. *Id*. at 69. Petitioner told Christie that she ruined his life and that her parents had "turned on him," and they were on her side. *Id*. Petitioner said he had no choice. *Id*. at 69.

Petitioner told her she could not go to police. *Id*. Petitioner wanted Christie wanted to spend the night at his house, returning to her parents' house in the morning, and say she found her parents dead. *Id*. Christie refused, knowing if she went with Petitioner, he would kill her. *Id*. at 72.

Christie persuaded Petitioner into letting her leave. *Id*. at 69. Christie asked Petitioner for the shotgun, but he refused to give it to her. *Id*. He did, however, at her request, unload the gun while they were in the driveway. *Id*. Petitioner walked Christie to her father's car. *Id*. at 70. She was still holding MM. *Id*. Christie backed up the car and drove around Petitioner's truck, which was parked at the end driveway. *Id*. She drove directly to the Chatham Police Department. *Id*. at 71.

Scott Bryant lived across the street from Dennis and Carolyn Lynch. *Id*. at 52. He testified that on June 27, 2006, he heard three gunshots. *Id*. at 52-55. The first two gunshots were fired in immediate succession; third gunshot was fired about three or four seconds later. *Id*.

2.      The Aftermath

About two hours after the incident, Columbia County Sheriff's Investigator William Foster ("Foster") established contact with Petitioner. *Id*. at 174-76. After obtaining Petitioner's cellular telephone number from Christie, Foster left a message for Petitioner to call him back. *Id*. Petitioner returned Foster's telephone call. *Id*. Foster told Petitioner that he needed to know what happened, and that he wanted to hear Petitioner's side of the story. *Id*. Petitioner, responded, "I wish I were dead." *Id*. at 177. Petitioner told Foster he was about an hour away, and that he needed "some time to think." *Id*. at 177-78. Petitioner told Foster he did not remember where the gun was. *Id*. at 178. Foster tried to arrange a meeting, but Petitioner needed "more time" to think. *Id*. Petitioner promised to call Foster back in twenty minutes and

ended the call.  *Id.*  Foster did not hear back from Petitioner, and Foster's attempt to reach Petitioner were unsuccessful.  *Id.* at 179.

Petitioner's cousin, John LeClaire testified that Petitioner knocked on his front door at approximately 2:00 a.m. on July 28, 2006.  (Dkt. No. 21-1 at 40, 42-44.)  Petitioner said something had happened in Columbia County and that he did not trust the state police.  *Id.* at 51-52.  Petitioner told LeClaire that he went to the Lynches' home to talk with Christie and her parents, and that he had brought a gun to "get their attention."  *Id.* at 53.  As he walked through the front door, Dennis Lynch saw the gun, and they wrestled and the gun went off.  *Id.* at 53-54.  Petitioner repeatedly said, "poor Christie," and remarked "she's got to live with this, and I am going to have to live with this."  *Id.* at 57, 58-59.  LeClaire asked if Dennis had been shot and Petitioner replied that he did not know.  *Id.* at 63.

Petitioner was wearing a short sleeve shirt, blue jeans that were wet around the line of his underpants, and sneakers.  *Id.* at 44-46.  LeClaire asked Petitioner if he had urinated in his pants; Petitioner said no.  *Id.* at 61-62.  On cross-examination, LeClaire testified that Petitioner stated he had been feeling depressed, had spent several nights lying in bed crying, and had contemplated committing suicide by burning down his house with gasoline with himself inside.  *Id.* at 59-61.

Petitioner paced in LaClaire's garage while he awaited a return telephone call from his lawyer.  *Id.* at 54.  After speaking his attorney, Petitioner made arrangements to turn himself at the Mechanicville Police Station.  Thereafter, Columbia County Sheriff Deputies arrived and took Petitioner into custody.

Petitioner made two spontaneous statements to Columbia County Sheriff Deputy Kenneth Stern ("Stern"), who was tasked with processing Petitioner in the booking area.  (Dkt. No. 21-1

at 17-18.) According to Stern, about an hour after being processed, Petitioner stated, "I don't know what I was thinking. I just lost control. It's always the good people that get hurt." *Id.* at 154. Approximately one hour later, Petitioner, said, "I wish I could go back in time." *Id.* at 155. Stern commented, "yeah," and Petitioner stated, "I don't know what I would do differently. I don't know." *Id.*

Petitioner's former jail cell mate, Peter Rupp[4], testified that Petitioner offered to pay him $20,000 to kill Christie, because "dead women don't testify." *Id.* at 106-08. According to Rupp, Petitioner devised various plans for the crime, all of them contingent on his son not being present, including using an assault rifle to shoot Christie from a distance, and running her car off of the road. *Id.* at 108.

Rupp testified that on two separate occasions, Petitioner discussed the gun in this case. *Id.* at 113. In the first conversation, Petitioner said that the gun "was in some water," and in the second conversation, that it would never be found, because it was in the Hudson River. *Id.* at 114.

According to Rupp, Petitioner once asked him if he thought Petitioner was guilty. As Rupp plugged his ears to avoid hearing Petitioner's response, Petitioner gave "a wink and a nod." *Id.* at 112-13.

On cross-examination, Rupp testified that while in jail, he and Petitioner had a fist fight and, as a result, Rupp was sent to a solitary cell. *Id.* at 135-36. Rupp came forward with this information after the fist fight. *Id.* at 135-36, 143-44. He denied being offering anything in exchange for his testimony. *Id.* at 159.

---

[4] Rupp testified that he had an extensive criminal history that included conviction for public lewdness, aggravated harassment, endangering the welfare of a minor, and attempted criminal trespass, for which he received fines, probation, and jail time. *Id.* at 103-05.

3.     The Forensic Evidence

On June 28, 2006, crime scene investigators found that wires in the telephone box outside the Lynches' house had been pulled, disabling the land lines in the house.  (Dkt. No. 20-1 at 241-42.)  They found Dennis Lynch's body on the living room floor.  (Dkt. No. 22-2 at 308-09.) Carolyn Lynch's body was found on the landing at the bottom of the stairs, near an entrance to the living room.  *Id.*

Two 12-gauge shotgun shell casings, marked "A" and "B," were found near Dennis Lynch's body; a third shotgun shell casing, marked "C," was found near Carolyn Lynch's body. (Dkt. No. 20-1 at 257.)  Casings "A" and "C" were identified as "Remington Peters 12-gauge;" casing B was not identified.  *Id.*

Projective shell fragments were recovered from the interior baseboard between the kitchen and dining room, along with fragments recovered from the rear wall playroom.  *Id.* at 258-59.

Two bloody, left footed footwear impressions were found on an area rug in the living room.[5]  (Dkt. No. 22-2 at 311.)  There were no signs of forced entry through the door to the first floor bedroom.  (Dkt. No. 20-1 at 307.)  There was no evidence of blood in Petitioner's truck. (Dkt. No. 22-1 at 309.)  Christie Muller's cellular telephone was not secured during the investigation.  (Dkt. No. 20-1 at 310.)

Dr. Jeffrey D. Hubbard, a coroner and expert in pathology, performed the autopsies on the bodies of Dennis and Carolyn Lynch.  (Dkt. No. 21-1 at 48-49.)  Dr. Hubbard testified that

---

[5]  The parties stipulated that the STR DNA profiles from the swab of the footwear impression, the swab of the hardwood floor, and the swab of the bedroom carpet, matched the STR DNA from Dennis Lynch.  (Dkt. No. 21-1 at 124.)  The parties also stipulated that the STR DNA profiles from a swab of the wall matched the STR DNA profile from Carolyn Lynch.  *Id.*

Dennis Lynch died from a single point-blank shotgun wound to the chest. *Id*. at 66. Dr. Hubbard observed powder stipple also known as powder burn, which was caused by the gun being very close to Dennis Lynch's body when it was discharged. *Id*. at 54-58. The shotgun slug came to a stop inside Dennis Lynch's torso, so there was no exist wound, nor any question from which direction the shot came. *Id*. at 66.

Carolyn Lynch died from a single shotgun wound to the neck with extensive destruction of the heart. *Id*. at 66-67. The bullet entered her body at the left side of her neck and exited at the right side of her back. *Id*. at 65. Although Dr. Hubbard did not specify the range from which Carolyn Lynch was shot, he detected heat alteration in the skin around Carolyn Lynch's entry and exit wounds, and microscopic black deposits around the entry would, which meant the weapon had to be discharged close enough to her skin for the hot gases from the muzzle and projectile to enter her body. *Id*. at 64-65. Dr. Hubbard was unable to determine the sequence in which the Lynches were shot. *Id*. at 94.

4.     Petitioner's Testimony

Petitioner testified on his own behalf. (Dkt. No. 22-1 at 98.) He talked about his family history and his occupation, including that from December 1998 until May 2005 Petitioner was a police officer in North Carolina. *Id*. at 103-04. After moving to New York in 2005, Petitioner worked as an automobile mechanic. *Id*.

According to Petitioner, he called Christie on June 27, 2006, to tell her how upset he was that she took all of her belongings from the house without giving Petitioner any warning or reasoning. *Id*. at 104-105. In response, Christie told Petitioner that her lawyer said she could take whatever she wanted to take. *Id*. at 105-06. He told her that he did not know why she was doing this to him and that he wanted to kill himself. *Id*. at 106. Christie told Petitioner to go

ahead and kill himself because then she and MM would get everything, including social security. *Id*. at 107.

After this conversation, Petitioner wanted to kill himself. *Id*. He took three shotgun shells from his dresser. *Id*. Because he did not have any guns in the house, he drove to his friend Jason Welch's house. *Id*. Petitioner knew Welch had a shotgun sitting by the door. *Id*. at 107-08, 151, 168. Petitioner entered Welch's house without permission and took the shotgun. *Id*.

Petitioner then drove to the Lynches' house because he wanted to kill himself in front of Christie. *Id*. at 109. Petitioner parked his truck at the bottom of the driveway and pulled the telephone wires so that Christie could not call the police. *Id*. at 113-14. Petitioner then went near the window by Christie's bedroom and tried calling her on her cellular telephone but she did not answer. *Id*. at 114, 116. He then knocked on her window with his hand, but she did not answer. *Id*. at 116-17. Finally, he banged on the window with the barrel of the shotgun. *Id*. at 116-17. Petitioner heard Christie call to her father. *Id*. at 118-19. Petitioner walked around the side of house by the porch and climbed up to the deck. *Id*. at 118-19.

Petitioner walked two or three steps into the house. *Id*. at 121-22. He saw Christie and then she went back into the bedroom, shutting the door. *Id*. Petitioner heard Dennis Lynch say "Billy," and then proceeded to asked Petitioner what he was doing. *Id*. at 123. Petitioner told Dennis that he just wanted to talk to Christie because he was "done" and he "couldn't deal with it anymore." *Id*. Petitioner told Dennis Lynch that he wanted to kill himself, and Dennis Lynch responded, "no, you're not going to kill yourself." *Id*. Dennis Lynch grabbed the gun. *Id*.

Petitioner and Dennis Lynch struggled for control of the gun. *Id*. at 123. During the struggle, Petitioner's finger was on the trigger, and the gun went off, while Petitioner was facing

the direction of the sliding door. *Id*. at 124. Petitioner explained how they each had one hand on the slide of the shotgun and one hand on the grip. *Id*. at 127-28.

The gun fired a second time while Petitioner was facing in the direction of the stairs in the living room. *Id*. at 128. Dennis Lynch told Petitioner to let go of the gun. *Id*. at 130. Petitioner responded, "I can't let go." *Id*. The gun went off a third time while it was pointing directly at Dennis. *Id*. at 133-35. Dennis looked at Petitioner; Dennis fell down. *Id*. at 124-36. According to Petitioner, the struggle with the gun lasted approximately five seconds. *Id*. at 135.

Petitioner stood over Dennis Lynch's body, for about "a minute." After realizing Dennis was not going to move, Petitioner stepped over Dennis Lynch's body and walked into the living room. *Id*. at 136. Petitioner saw Carolyn Lynch's leg sticking out from the stairs. *Id*. He could "just tell" that Carolyn Lynch was "messed up." *Id*.

Petitioner walked towards Christie's bedroom and ejected the shell from the gun, although he could not recall why he did that. *Id*. Petitioner leaned the gun against the wall on the way to Christie's bedroom. *Id*. At this point, Petitioner felt as if he was "in another world." *Id*. at 136-38. Petitioner stopped in front of Christie's door and leaned against door and the bathroom door and then knocked on Christie's door. *Id*. Christie opened the door, and then went back in the bedroom. *Id*. at 137.

In the bedroom, Christie begged Petitioner not to shoot her. *Id*. at 13. According to Petitioner, Christie kept saying "don't shoot me, don't shoot me," over and over. *Id*. at 137. Petitioner led Christie to the kitchen and told her "don't look," and "close your eyes." *Id*. at 138. He picked up the gun. *Id*. Once in the kitchen, Petitioner put the gun down and told her that her parents were dead. *Id*. at 140. He said it was an accident and that he did not mean to kill them.

*Id.* at 140.  While in the kitchen, Christie had a knife in her hand, but she did not try to stab him, or to do anything with the knife.  *Id*. at 139.

Petitioner told Christie he was sorry and that it was an accident.  *Id*. at 140.  He told Christie that he was not going to hurt her.  *Id*.  Christie said that nobody would believe him, and that Petitioner would go to jail.  *Id*.  Christie told Petitioner to take MM and go to North Carolina.  *Id*. at 140-42.

Christie asked for the gun, but Petitioner would not give it to her.  *Id*. at 141.  Petitioner convinced Christie to leave the house.  *Id*.  Petitioner walked Christie to her father's car.  *Id*.  As they walked to the car, Christie held onto the barrel of the gun.  *Id*. at 142.  Christie kept saying, "you're going to shoot me, you're going to shoot me."  *Id*.  Petitioner told Christie that he would not shoot her.  *Id*.

Christie then told Petitioner she was going to say that "somebody broke in the house."  *Id*. at 142.  She asked Petitioner to unload the gun.  *Id*.  Petitioner pumped the gun a "few times" to show her there were no bullets in the gun.  *Id*.  He did not remember any bullets coming out.  *Id*.

Petitioner then got into his truck and drove away.  *Id*. at 145.  He called his mother and told her "something happened" and that Dennis and Carolyn were dead.  *Id*. at 145.  He told his mother he "didn't mean it, that it was an accident."  *Id*.  Petitioner's mother told him to call his lawyer.  *Id*. at 145.  After speaking with his mother, Petitioner left a message for his lawyer.  *Id*.

Petitioner pulled his truck over to the side of the road.  *Id*. at 146.  He parked next to a farm.  *Id*.  There was a pond.  *Id.*  He sat in his truck for about forty-five minutes.  Id.  He was scared because Christie said nobody would believe his story, and he did not know if Christie was

going to say that somebody broke into her parents' house. *Id*. But Petitioner knew it was an accident, and that he should tell somebody. *Id*. He testified that "he still had the gun." *Id*.

Petitioner then jumped into the pond. 146. He threw the gun in the water. *Id*. He got out of the pond, and sat in his wet clothes. *Id*. Petitioner then changed into dry extra work clothes that he kept in his truck. *Id*. at 147. He did not change out of his wet underwear because he did not have an extra pair in the truck. *Id*. He left his wet clothes on the ground near the pond. *Id*. at 147.

Petitioner got back into his truck, and called his mother again. *Id*. at 147. She told him to go to John LeClaire's house. *Id*. While driving to his cousin's house, Petitioner received a telephone call from Investigator Foster. *Id*. at 148. He called Foster back. *Id*. at 149. After speaking with his attorney, Petitioner turned himself in to the Mechanicville Police. *Id*. at 148-50. Petitioner denied soliciting Rupp to kill Christie. *Id*. at 150.

During cross-examination, the People elicited that while in the North Carolina Police Academy, Petitioner had received training in crime scene investigations and forensic evidence. *Id*. at 156-57. He was trained using weapons. *Id*. at 157. He was trained in defensive tactics, including how to disarm another person. *Id*. at 157-58. Petitioner testified he was proficient at operating a shotgun, and that he received perfect scores at the shooting range in 2002, 2003, and 2004. *Id*. at 159.

On cross-examination, Petitioner testified that he did not remember physically loading the shotgun. *Id*. at 166. He could not recall disabling the safety, but assumed it was because the gun fired. *Id*. at 162. Petitioner admitted placing or receiving eleven telephone calls after the incident. *Id*. at 178-79. Petitioner never dial 911 for assistance. *Id*. at 177. Petitioner testified the gun was in the pond. *Id*. at 179.

### 5. Jennifer Day's Testimony

Petitioner's sister, Jennifer Day ("Day"), testified that she met Christie in high school. (Dkt. No. 22-1 at 52.) Day introduced Christie to Petitioner. *Id.* After the Lynches' deaths, Day and Christie kept in touch, sometimes discussing the case. *Id.* Day also communicated regularly with Petitioner after the incident. *Id.* at 53-54.

According to Day, on October 1, 2007, Christie described the events leading to the Lynches' deaths. Christie told Day that she saw Petitioner outside of the house, holding a gun. Christie called out to her father, telling him that Petitioner was there. Christie did not tell her father that Petitioner was carrying a gun. While in her bedroom, Christie heard Petitioner and her father "fighting," after which she heard three gunshots. After the incident, Christie told Petitioner to take MM and go to North Carolina.

On October 15, 2006, Day and Christie met at a Pumpkin Patch with their children. Thereafter, the District Attorney yelled at Christie for speaking with Day, and threatened to force MM to testify at trial if she did not stop talking about the case. *Id.* at 58. According to Day, during another conversation sometime after October 15, 2006, Christie stated Petitioner "wasn't himself" on June 27, 2006. Christie described Petitioner as appearing pale, with glassy-eyed, robotic in his movements, and that he spoke in monotone. *Id.* at 56-57.

On cross-examination, Day admitted that she saw her brother right after Christie testified and one other time during the trial. *Id.* at 74. Day denied that she tried to persuade Christie not to testify at the trial. *Id.* at 79-80.

### 6. Expert Testimony

Charles Haase ("Haase"), an expert in Ballistics and Crime Scene Investigations, testified for the defense. (Dkt. No. 22-1 at 208, 217.) He reviewed the various police reports and autopsy

reports and test-fired a 12-gauge shotgun with similar firing characteristics to the gun used in the shooting of Dennis and Carolyn Lynch. *Id*. at 218-220, 222, 229-39, 244, 250-53. Haase concluded the shot that killed Carolyn Lynch was fired from an approximate distance of sixteen feet. *Id*. at 247. Hasse conclude the shot that killed Dennis Lynch was fired from no more than an inch away from his body. *Id*. at 262.

Haase testified that police officers are generally trained to fire at the "center of mass," and not at extremities when shooting. *Id*. at 276-77. Haase testified that one could manipulate the slide of a shotgun and fire it within a fraction of a second. *Id*. at 269. He further testified that, when the gun is not being aimed, three shots could be fired within a five-second period. *Id*. He said this was particularly true if two people were struggling over the gun because the mass of two people holding the gun would absorb the recoil more easily than that of one person. *Id*. at 272-76.

### 7. The People's Rebuttal

The People called two witnesses on rebuttal: Thomas L. Martin, a Senior Investigator from the Forensic Identification Unit of the New York State Police, who testified about the various measurements he took at the crime scene, and Craig Grazier, an expert in the field of ballistics, who testified about the mechanics of a Remington 870 pump action shotgun, explaining that in order to fire such a gun, it must be "pumped" to load another round into the chamber. (Dkt. No. 22-1 at 345-348.)

### 8. Jury Charge, Verdict, Sentencing

On April 17, 2006, at the conclusion of the trial, the County Court submitted to the jury two counts of first degree murder, and the lesser included offense of second degree manslaughter for each count. (Dkt. No. 23-1 at 100-41.) Petitioner renewed his motion for a trial order of

dismissal, arguing the People failed to establish a *prima face* case as to all charges, especially as to the issue of intent. (Dkt. No. 22-1 at 354.) The County Court denied the motion. *Id*. at 354-55.

Later that day, the jury returned a verdict of guilty on each count of first degree murder. (Dkt. No. 22-3 at 156-59.) On June 19, 2007, Petitioner was sentenced to two concurrent terms of life in prison without parole. (Dkt. No. 36-2 at 256-57.)

## C.    THE DIRECT APPEAL

Petitioner retained Mitch Kessler, Esq., as appellate counsel. The issues raised by Petitioner on his direct appeal included whether County Court violated Petitioner's : (1) right to present a defense by precluding him from raising the affirmative defense of extreme emotional disturbance and from prohibiting Petitioner from testifying about and relying on hospital records regarding his mental state; (2) right of confrontation by curtailing the cross-examination of Petitioner's wife regarding her pecuniary interest in Petitioner's conviction, her refusal to permit defense counsel to view the crime scene, and her desire to see Petitioner convicted; (3) right to due process by admitting the testimony of Peter Rupp; and (4) right to due process by refusing to compel the People to disclose recordings of Petitioner's telephone conversations. (Dkt. No. 14-1 at 41-63.) Petitioner also claimed the sentence was harsh and excessive. *Id*. at 64-65.

The Appellate Division unanimously affirmed the judgment of conviction entered against Petitioner. *People v. Muller*, 899 N.Y.S.2d 425 (3d Dep't 2010). The Court of Appeals denied leave to appeal on July 20, 2010. *People v. Muller*, 907 N.Y.S.2d 465 (Table) (2010).

## D.    SECTION 440.10 MOTION TO VACATE JUDGMENT OF CONVICTION

On October 6, 2011, represented by present counsel, Joel B. Rudin, Esq., Petitioner moved to vacate the conviction under CPL § 440.10, arguing (1) trial counsel provided

ineffective assistance; (2) the prosecutor failed to timely provide *Brady* material; and (3) jury taint. (Dkt. No. 16-1 at 78-113.)

Specifically, Petitioner claimed trial counsel was ineffective for: (a) failing to comply with the County Court's order to serve upon the People a notice of intention to offer psychiatric evidence and to disclose to the People medical records documenting Petitioner's psychiatric history, resulting in the preclusion of Petitioner's extreme and emotional disturbance defense; (b) failing to consult with any psychiatric or psychological expert relating to Petitioner's extreme emotional disturbance defense; (c) failing to interview or to call to testify potential defense witnesses who would have supported Petitioner's extreme emotional disturbance defense; (d) needlessly prompting a prospective juror during *voir dire* to state that she read in a newspaper that Petitioner had confessed to the murders; and (e) failing to object to the prosecutor's summation commenting that Petitioner has never before told anyone that he was suicidal at the time of the shooting and that the shooting was accidental. *Id*. at 78-106.

In support of this motion, affidavits were submitted by Petitioner, Petitioner's mother Sue Ann Muller, friend Kristen A. Hanley, cousin Melissa A. Thompson, current wife Laura Muller, and private investigator Marilyn A. Green. (Dkt. No. 16-1 at 48-64.) Petitioner also submitted an affidavit and report of Sanford L. Drob, Ph.D., a forensic psychologist. (Dkt. No. 1-4 at 2-26.)

In a Decision and Order, dated July 20, 2012, County Court denied Petitioner's § 440.10 motion. (Dkt. No. 17-3 at 2-14.) On September 27, 2012, Petitioner's application pursuant to CPL § 460.15 for permission to appeal to the Appellate Division was denied. (Dkt. No. 1-2 at 2.)

### E.     THE *CORAM NOBIS* PETITION

On or about October 1, 2012, represented by present counsel, Petitioner sought a writ of error *coram nobis* in the Appellate Division.  (Dkt. No. 18-1.)  Petitioner argued appellate counsel rendered ineffective assistance by failing to assert the claim of ineffective assistance of trial counsel based upon trial counsel's "poisoning" of the jury against Petitioner during *voir dire*. *Id*. at 16-20.  Specifically, trial counsel elicited from a prospective juror that Petitioner "confessed" to the crime, an error amounting to *per se* ineffective assistance.  *Id*. at 16.  In open court, trial counsel asked the prospective juror for her basis for believing that Petitioner had made a confession and the prospective juror responded that she had read it in the newspaper.  *Id*. Although that prospective juror was not selected, one juror and two alternates from that panel were selected to serve at Petitioner's trial.  *Id*. at 17.

On December 21, 2012, the Appellate Division denied the motion.  (Dkt. No. 18-2 at 2.) The Court of Appeals denied leave to appeal on June 27, 2013.  (Dkt. No. 18-3 at 2.)

### F.     THE HABEAS CORPUS PETITION

Petitioner has raised five grounds for habeas review:

(1) The County Court violated his due process rights when it precluded Petitioner from raising an extreme emotional disturbance defense and barred him from introducing evidence of prior suicide attempts in support of his defense;

(2) Trial counsel provided ineffective assistance of counsel when he (a) failed to comply with the trial court's order to serve upon the People a notice of intention to offer psychiatric evidence and to disclose to the People Petitioner's medical records documenting his psychiatric history; (b) failed to consult with any psychiatric or psychological expert or have such expert evaluate Petitioner relating to his psychiatric defense of extreme emotional disturbance and "lack of specific intent," as well as counsel's decision not to serve a proper CPL § 250.10 notice; (c) failed to interview or call potential defense witnesses who would have supported Petitioner's psychiatric defenses; (d) needlessly prompted a prospective juror to comment in open court that she had read in a newspaper that Petitioner confessed to the crime; and (e) failed to object to the prosecutor's summation comments that Petitioner had never before told

anyone that he was suicidal at the time of the shooting and that the shooting was
accidental;

(3) Appellate counsel was ineffective in failing to raise on direct appeal the claim that
trial counsel was ineffective for questing the prospective juror about Petitioner's
confession;

(4) The County Court violated Petitioner's right to present a defense when it curtailed the
cross-examination of Petitioner's wife; and

(5) The People suppressed *Brady* material, including statements by five witnesses
confirming the fact that Petitioner suffered from serious depression and suicidal
ideation, and mislead the jury by arguing in summation that Petitioner recently
fabricated his defense of accident.

(Dkt. No. 1 at 16-17.)

In opposition, Respondent concedes the petition is timely and argues that all of

Petitioner's claims are exhausted and without merit.  (Dkt. No. 11.)  This Court agrees.

## III.    STANDARD OF REVIEW

### A.    Exhaustion Requirement under the Antiterrorism and Effective Death
Penalty Act of 1996

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs

applications of incarcerated state court defendants seeking federal habeas corpus relief.  *See* 28

U.S.C. § 2254.  Before a federal court may consider an application for habeas corpus relief

pursuant to 28 U.S.C. § 2254, the petitioner must generally have exhausted all the remedies

available in the courts of the state in which he or she was convicted.  28 U.S.C. § 2254(b)(1)(A);

*see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) ("Section 2254(b) requires that prisoners

must ordinarily exhaust state remedies before filing for federal habeas relief.");  *Jones v. Murphy*,

694 F.3d 225, 246-47 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1247 (2013) ("Under AEDPA, a

prisoner in custody pursuant to a state court judgment must generally exhaust state court

remedies before seeking federal habeas corpus review.").

"Exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Cornell v. Kirkpatrick*, 665 F.3d 369, 375 (2d Cir. 2011) (citation and internal quotation marks omitted); *Daye v. Attorney General of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*) (proper exhaustion requires that both the factual and legal premises of claim be "fairly presented" to the state court). "Passage through the state courts, in and of itself, 'is not sufficient.' *Picard* [*v. Connor*, 404 U.S. 270, 275 (1971)]. To provide the State with the necessary 'opportunity,' the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Wilens v. Superintendent of Clinton Correc. Fac.*, No. 11-CV-1938 (JFB), 2014 WL 28995, at *5 (E.D.N.Y. Jan. 2, 2014) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

Petitioner bears the burden of proving exhaustion. *Colon v. Johnson*, 19 F. Supp. 2d 112, 119-20 (S.D.N.Y. 1998) (citations omitted).

### B.     Review of State Court Decisions on the Merits under the AEDPA

Under the AEDPA, an application for a writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Recognizing the principle that "[s]tate courts are adequate forums for the vindication of federal rights . . ., AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 134 S. Ct. 10, 15-16 (2013); *see also Cullen*, 563 U.S. at 181 ("This is a difficult to meet . . . and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt[.]") (citation and internal quotation marks omitted).

"For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001). Under the AEDPA, a summary disposition by a state court constitutes a disposition on the merits. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Where AEDPA's deferential standard of review applies, "[a] state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence." *Bierenbaum v. Graham*, 607 F.3d 36, 48 (2d Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)), *cert. denied*, 131 S. Ct. 1693 (2011). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 291 (2010).

In determining whether a state court has adjudicated a claim "on the merits," a federal habeas corpus court must classify the state court decision as either (1) fairly appearing to rest primarily on federal law or to be interwoven with federal law; or (2) fairly appearing to rest primarily on state procedural law. *Jimenez v. Walker*, 458 F.3d 130, 145 (2d Cir. 2006). Decisions in the first category are deemed to have been made "on the merits" of the federal claim. *Id.*

A decision "on the merits" is contrary to clearly established federal law when it is either contrary to Supreme Court precedent on a question of law or opposite to a relevant Supreme Court case with materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). "Section 2254(d)(1)'s 'clearly established' phrase refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decisions." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citation and internal quotation marks omitted). "[F]ederal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002). "[C]ircuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court . . . [and] cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (citation and internal quotation marks omitted).

A state court unreasonably applies federal law when it correctly identifies the governing legal rule in a particular case but applies the rule to the facts in an "objectively unreasonable" manner. *Lockyer*, 538 U.S. at 75. An erroneous application of federal law is not necessarily an unreasonable one. *Williams*, 529 U.S. at 413. "Under § 2254(d)(1), 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (per curiam) (quoting *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)); *see also Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) (per curiam) ("It is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's

precedents.'") (quoting *Richter*, 562 U.S. at 101). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76 (quoting *Taylor*, 529 U.S. at 411).

Federal habeas corpus review is limited to determining whether petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. §§ 2241(c), 2254(a); *see also Wainwright v. Goode*, 464 U.S. 78, 83 (1983) ("[F]ederal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension."). Federal habeas relief does not "lie for errors of state law." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). Petitioner has the burden of proving by a preponderance of the evidence that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); *see also Smalls v. Batista*, 191 F.3d 272, 278 (2d Cir. 1999). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Richter*, 131 S. Ct. at 786. Where a claim has been adjudicated on the merits by a state court, federal habeas review is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen*, 131 S. Ct. at 1398.

## IV.    ANALYSIS

### A.    Ground One:  The County Court's Preclusion of Extreme Emotional Disturbance Defense and Limitation of Petitioner's Mental State

Petitioner claims, as he did on his direct appeal, that the County Court's actions in barring Petitioner from raising the defense of extreme emotional disturbance and from introducing evidence of his prior suicide attempts in support of his defense of lack of specific intent and of accident, violated Petitioner's Fifth, Sixth, and Fourteenth Amendment right to

present a defense and to due process of law.  (Dkt. No. 1 at 16, 7.)  The Appellate Division rejected this claim.  *People v. Muller*, 899 N.Y.S.2d 425 (2010).

A criminal defendant has a constitutional right under the Sixth Amendment's Compulsory Process and Confrontation Clauses and the Fourteenth Amendment's Due Process Clause to "a meaningful opportunity to present a complete defense."  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  "Indeed, '[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense.'"  *Hawkins v. Costello*, 460 F.3d 238, 243 (2d Cir. 2006) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)); *Grotto v. Herbert*, 316 F.3d 198, 205-06 (2d Cir. 2003) (It is "well established as a fundamental matter of due process that the defendant in a criminal case has the right to present a defense, that is, to present to the jury admissible evidence that might influence the determination of guilt.").

"As with many rights, the right to present a defense is not unlimited."  *Jimenez v. Walker*, 458 F.3d 147, 147 (2d Cir. 2006).  Indeed, criminal defendants "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."  *Chambers*, 410 U.S. at 302; *Rock v. Arkansas*, 483 U.S. 44, 55-56 (1987).  However, restrictions on a criminal defendant's right "to confront witnesses and to present evidence 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'"  *Michigan v. Lucas*, 500 U.S. 145, 511 (1991) (quoting *Rock*, 483 U.S. at 55-56); *see Taylor v. Illinois*, 484 U.S. 400, 410 (1988).  In this case, the rule of procedure at issue is CPL § 250.10.

### 1.     Extreme Emotional Disturbance

Under New York law, extreme emotional disturbance is an affirmative defense to murder, reducing liability to manslaughter, provided the defendant can show he "acted under the

influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation." CPL § 250.10(2); *see People v. Diaz*, 904 N.Y.S.2d 343, 346 (2010). Thus, "[t]he extreme emotional disturbance defense does not absolve the defendant of criminal responsibility, but allows him/her to demonstrate the existence of mitigating factors which indicate that he/she should be punished less severely because the intentional homicide resulted from an understandable human response deserving mercy." *People v. Cass*, 942 N.Y.S.2d 416, 423 n.4 (2012) (citations omitted).

The defense of extreme emotional disturbance has both a subjective and objective element. First, the defendant must have "acted under the influence of extreme emotional disturbance," and second, there must be a "reasonable explanation" for such emotional disturbance, "determined from the viewpoint of a person in the defendant's situation under the circumstances as he perceived them at the time, however inaccurate that perception may have been[.]" *Cass*, 942 N.Y.S.2d 423 (quoting *People v. Casassa*, 427 N.Y.S.2d 769, 775 (1980)). "A defendant cannot establish an extreme emotional disturbance defense without evidence that he or she suffered from a mental infirmity not rising to the level of insanity at the time of the homicide[.]" *People v. Roche*, 745 N.Y.S.2d 775, 780 (2002). The subjective elements requires "a mental infirmity not rising to the level of insanity at the time of the homicide, typically manifested by a loss of self-control." *Id.*

Pursuant to CPL § 250.10(2), a defendant is "precluded from raising any defense predicated on mental infirmity, including extreme emotional disturbance, if the defendant fails to file and serve a timely notice of intent to present psychiatric evidence." *Diaz*, 904 N.Y.S.2d at

346.[6]  The notice "must be served and filed before trial and not more than thirty days after entry

of the plea of not guilty at the indictment."  CPL § 250.10(2).  "In the interest of justice and for

good cause shown, however, the court may permit such service and filing to be made at any later

time prior to the close of the evidence."  CPL § 250.10(2).  Once notice is given under CPL §

250.10(2), the prosecution may apply to the trial judge for an order directing the defendant to

submit to an examination by a psychiatrist selected by the prosecution.  CPL § 250.10(3).

In this case, the County Court precluded from Petitioner from submitting "any proof as to

any basis of an affirmative defense of extreme emotional disturbance . . . at the time of trial."

(Dkt. No. 36-2 at 89.)  A defendant's right to present evidence is not unlimited, but rather is

subject to reasonable restriction.  *See Taylor v. Illinois*, 484 U.S. 400, 410 (1988).  "A state

evidentiary rule is 'unconstitutionally arbitrary or disproportionate only where it has infringed

upon a weighty interest of the accused.'"  *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006)

(quoting *Scheffer*, 523 U.S. at 308).  Absent special circumstances, the notice requirement of

CPL § 250.10 has been upheld as a constitutional restriction on the right to present evidence.

*See Almonor v. Keane*, 27 F. App'x 10, 12 (2d Cir. 2001) (denying habeas relief for trial court's

preclusion of psychiatric evidence under CPL § 250.10); *Bien v. Smith*, 546 F. Supp. 2d 26, 45-

46 (E.D.N.Y. 2008) (same); *Rios v. Artuz*, No. 07-CV-330 (NGG), 2007 WL 1958899, at *5-6

(E.D.N.Y. June 29, 2007) (same).

Because precluding evidence as a sanction implicates a defendant's Sixth and Fourteenth

Amendment rights, a trial court deciding whether to bar psychiatric evidence must balance "a

---

[6]  Pursuant to CPL§ 250.10(2), "[p]sychiatric evidence is not admissible upon a trial unless the
defendant serves upon the people and files with the court a written notice of his intention to
present psychiatric evidence.  Such notice must be served and filed before trial and not more than
thirty days after entry of the plea of not guilty to the indictment.

defendant's constitutional right to present witnesses in his own defense" against "prejudice to the People from the belated notice." *People v. Berk*, 88 N.Y.2d 257, 266 (1996). Accordingly, "state preclusion rules may not be applied mechanically; rather a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify," *Rock v. Arkansas*, 483 U.S. 44, 23 (1987), or "to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

The New York Court of Appeals has stated "[t]he statutory notice provision [of CPL § 250.10] is grounded on principles of fairness and is intended 'to prevent disadvantage to the prosecution as a result of surprise.'" *Diaz*, 904 N.Y.S.2d at 347 (quoting *Berk*, 644 N.Y.S.2d at 661). In *Diaz*, the court held that a defendant must serve psychiatric notice even when it only involves lay testimony, explaining that "the aims of CPL 250.10's notice requirement—preventing unfair surprise and allowing the People an opportunity to obtain evidence from any source, expert or otherwise—are implicated whether a defendant seeks to establish a mental infirmity through expert or lay testimony, whether by the defendant or other persons, such as witnesses to the events related to the crimes charged." *Id.* at 348.

Here, by failing to give proper notice pursuant to CPL § 250.10, Petitioner placed the prosecution at a substantial disadvantage for months. As the Appellate Division found, Petitioner "not only filed a notice that was untimely and inadequate, but throughout the period leading up to trial, he repeatedly ignored legitimate requests made by the prosecution for more information regarding the specifics of this psychiatric defense." *People v. Muller*, 899 N.Y.S.2d 425, 430 (2010). It was not until February 23, 2007, approximately one month before trial, counsel revealed that the extreme emotional disturbance defense was based upon Petitioner's depression and past suicide attempts. (Dkt. No. 36-2 at 46-51.)

Based upon the record, the County Court's preclusion of the extreme emotional disturbance defenses was not applied "mechanically." *See Rock*, 483 U.S. at 23. As the Appellate Division found, the County Court "made a measured effort to balance" Petitioner's right to offer this defense at trial and the People's need for the information. *Id*. at 1333. Indeed, despite not providing the People with proper notice, the County Court exercised is discretion and ruled that Petitioner would be permitted to present the defense of extreme emotional disturbance provided that Petitioner file and serve an amended CPL § 250.10 notice, and that Petitioner submit to a psychiatric examination by an expert selected by the People. (Dkt. No. 36-2 at 56-57.) It was not until Petitioner failed to comply with either condition that the County Court precluded Petitioner from presenting the extreme emotional disturbance defense. Indeed, as the Appellate Division found, Petitioner had "engaged in a course of conduct during the period leading up to trial that was clearly designed to deny the prosecution access to any meaningful information regarding the details of this proposed offense. *People v. Muller*, 899 N.Y.S.2d at 431.

### 2. Evidence of Suicide Attempts

Petitioner also argues the County Court erred in limiting Petitioner from presenting any evidence of his mental state—including his depression and suicide threats and attempts—unless it fell within four days of the shootings. (Dkt. No. 1 at 16; Dkt. No. 28 at 21.) The Appellate Division also rejected this claim. *People v. Muller*, 899 N.Y.S.2d at 432.

As an initial matter, the Appellate Court noted that the "introduction of such evidence, assuming it was relevant, would have entitled the prosecution [] access to any medical records regarding psychiatric treatment received by [Petitioner] before the shootings as well as those generated by his April 2006 hospitalizations." *Id*. As discussed above, Petitioner refused the

People's requests for medical records for months. Indeed, the People served a demand pursuant to CPL § 240.30 requesting any reports or documents, or portions thereof, from a mental health expert. The People followed up that request by letters dated November 20, 2006, January 19, 2007, and January 30, 2007. (Dkt. No. 36-2 at 9, 34, 38.) On February 9, 2007, the County Court executed an order to show cause why an order of preclusion "should not be entered against [Petitioner] from introducing in evidence any all and testimony concerning the affirmative defense of extreme emotional disturbance and any other related evidence[.]" *Id*. at 44. Thereafter, on February 23, 2007, the County Court ordered Petitioner to provide the April 2006 medical records referencing Petitioner's psychological or psychiatric background and incidents. *Id*. at 60. As discussed above, Petitioner did not comply with this requirement. (Dkt. No. 36-2 at 87-88.)

Moreover, the Appellate Division found Petitioner's "failed attempts at suicide and prior hospitalizations were only marginally relevant to [Petitioner's] core contention made at trial," and therefore, the "County Court properly exercised its discretion in limiting the admissibility of such evidence." *People v. Muller*, 899 N.Y.S.2d at 432.

In sum, the Appellate Division found that the County Court's "decision to put in place certain conditions that had to be met for [Petitioner] to be relieved from the defects contained in his notice represented a sound exercise of the court's decision, and [Petitioner's] failure to comply with these conditions left the court with no choice but to preclude him from asserting this affirmative defense." *Id*. at 430. "The trial court is granted broad discretion in making evidentiary rulings in connection with the preclusion or admission of testimony and such ruling should not be disturbed absent an abuse of discretion." *People v. Almonor*, 93 N.Y.2d 571, 583 (1999).

3. <u>Harmless Error</u>

Finally, even assuming *arguendo*, the County Court erred in precluding Petitioner from asserting an extreme emotional disturbance defense, any error was harmless because Petitioner never established that the elements of the defense existed. *See Fry v. Pliler*, 551 U.S. 112 (2007). When a defendant's constitutional rights have been violated as a result of trial error, a federal habeas court must determine whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry*, 551 U.S. 112 at 121 (2007).

As the Appellate Division found, even if the County Court improperly precluded the affirmative defense, Petitioner "would not have been prejudiced because he has never established that the requisite elements of such a defense in fact exist." *People v. Muller*, 899 N.Y.S.2d at 431 (Petitioner's contention "that these shootings were the result of a tragic accident is so at odds with any claim that he deliberately shot and killed the two victims while under the influence of an [extreme emotional defense], that it makes his assertion of such an affirmative defense inherently implausible, and underscores the legal insufficiency of the evidence previously submitted by him in support of it.") (internal citations omitted). Accordingly, any error in precluding the defense, or limiting evidence regarding Petitioner's suicide attempts was harmless.

In light of the foregoing, the Appellate Division's affirmance of the County Court's preclusion of the extreme emotional disturbance defense and limitation of evidence was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Accordingly, the Court recommends denying this claim.

**B.    Ground Two: Ineffective Assistance of Trial Counsel**

Next, Petitioner argues trial counsel provided ineffective assistance of counsel when he (a) failed to comply with the trial court's order to serve upon the People a notice of intention to offer psychiatric evidence and to disclose to the People Petitioner's medical records documenting his psychiatric history; (b) failed to consult with any psychiatric or psychological expert or have such expert evaluate Petitioner relating to his psychiatric defense of extreme emotional disturbance and "lack of specific intent," as well as counsel's decision not to serve a proper CPL § 250.10 notice; (c) failed to interview or call potential defense witnesses who would have supported Petitioner's psychiatric defenses; (d) needlessly prompted a prospective juror to comment in open court that she had read in a newspaper that Petitioner confessed to the crime; and (e) failed to object to the prosecutor's summation comments that Petitioner had never before told anyone that he was suicidal at the time of the shooting and that the shooting was accidental. (Dkt. No. 1 at 16.)

The Sixth Amendment mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const., amend VI. "[T]he right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).

To establish a violation of the right to effective assistance of counsel, a habeas petitioner must show: (1) that counsel's representation fell below an objective standard of reasonableness, measured in light of the prevailing professional norms; and (2) resulting prejudice, that is, a reasonable probability that but for counsel's unprofessional performance, the outcome would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). Under

*Strickland*, "counsel should be strongly presumed to have rendered adequate assistance and made all decisions in the exercise of reasonable professional judgment." *Id*. at 690.

In *Harrington v. Richter*, addressing the *Strickland* standard and its relationship to the AEDPA, the Supreme Court explained:

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [*Strickland*], 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The challenger's burden is to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." *Id*. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.
>
> "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. [356, 371], (2010). . . . Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S. at 690.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult [because] the standards created by *Strickland* and § 2254(d) are both "highly deferential" . . . and when the two apply in tandem, review is "doubly" so . . . . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

562 U.S. 86, 104 (some internal citations omitted).

1.    Trial Counsel's Overall Conduct

Initially, the Court notes that trial counsel's conduct was objectively reasonable. During his opening statement, counsel argued that the People's case hinged almost entirely on the testimony of Christie Muller. (Dkt. No. 20-1 at 48.) He asked the jury to evaluate Christie's credibility, and to note her interest in the outcome of the proceedings. *Id*. Counsel extensively cross-examined Christie, establishing she did not witness the shootings. *Id*. at 87, 89. Counsel elicited that Christie was dating another man and had commenced divorce proceedings. *Id*. at 137-40. Counsel tried to elicit from Christie that Petitioner was suicidal in April 2006, but the County Court sustained the People's objection, finding it was too remote to Petitioner's state of mind the night of the shootings. *Id*. at 98-103. Counsel elicited the inconsistencies between Christie's testimony, including, *inter alia*, her description of Petitioner's clothing the night of the shooting, how many gunshots she heard, and whether her bedroom door was locked. *Id*. at 114-121.

Counsel effectively cross-examined LeClaire and was able to elicit that Petitioner told him he had been feeling depressed and had spent several nights in bed crying. (Dkt. No. 21-1 at 193-94.). He elicited testimony that Petitioner had contemplated burning himself and the house down. *Id*. at 194-95.

Counsel vigorously cross-examined Rupp, a "jailhouse informant" with an extensive criminal history. Counsel elicited that Rupp did not come forward with Petitioner's proposition to kill Christie until after losing to Petitioner in a card game, which resulted in a fist fight. *Id*. at 249-63, 268-70, 276-88. Rupp further admitted that he followed Petitioner's case in the newspaper. *Id*. at 265-66.

Counsel moved to strike from the record all questions and responses referencing Petitioner's telephone calls while in jail. (Dkt. No. 22-1 at 199.) In addition, counsel elicited that the medical coroner was unable to determine the sequence of deaths. *Id*. at 94. At the close of the People's case, counsel moved to dismiss all counts of the indictment lack of proof. (Dkt. No. 22-1 at 8-20.)

Counsel put forth a compelling, albeit unsuccessful, defense based on the lack of intent and accident. He elicited testimony that Petitioner went to the Lynches' house to commit suicide in front of Christie. *Id*. at 108. Petitioner's sister testified regarding the credibility of Christie. *Id*. at 48, 54, 56, 77. Counsel retained an expert in the field of ballistics, who performed a series of tests. *Id*. at 208, 217. At the close of trial, counsel again moved to dismiss the case for lack of proof. *Id*. at 18-19.

Moreover, counsel delivered a compelling summation, arguing that the case revolved around intent, and intent alone. (Dkt. No. 23-1 at 23.) He argued that to prove intent, the People relied almost exclusively on Christie Muller. *Id*. And yet, Christie had some "significant inconsistencies" in her testimony. Counsel reminded that Christie initially stated she heard five shots fired, not three shots. *Id*. at 26. Christie testified her bedroom door was locked and Petitioner forced his way into the room after firing the shots, and yet, the investigator testified that he did not notice any damage to Christie's bedroom door. *Id*. at 28.

He talked about Petitioner's motive. *Id*. Counsel pointed out that despite Christie's testimony that Petitioner said he was going to kill her, and things like, "I killed your parents, you're next" and "you hurt me, you're going to be hurt," and "you know I have to kill you," and despite having ample opportunities to do, Petitioner never killed Christie. *Id*. Counsel argued it made even less sense that Petitioner intended to kill his in-laws. *Id*. at 25. Counsel described

Petitioner as having a "wonderful relationship" with the Lynches. *Id*. He stated that Petitioner was very close the Lynches; they lived together as a family unit. *Id*. He stated that Petitioner loved the Lynches, and he believed the Lynches loved Petitioner too. *Id*.

Counsel argued that perhaps Christie had motive to see Petitioner convicted, whether it was for her own happiness to be divorced and to "get away," or as revenge for the deaths of her parents. *Id*. at 31-32.

Counsel stressed that Petitioner subjected himself to the cross-examination of a highly skilled prosecutor in order to present the truth. *Id*. at 33. That truth, according to counsel, was that on June 26, 2006, Petitioner wanted to commit suicide and he wanted Christie to watch, especially after she goaded him on the telephone earlier that evening. *Id*.

Counsel discussed Petitioner's actions after the shootings. *Id*. at 45-66. He noted that Petitioner did not flee to North Carolina when he had the opportunity. *Id*. at 66. Instead, he called his mother, and then his lawyer, and he drove to his cousin's house, whereupon he voluntarily turned himself in to the police. *Id*. at 42. Finally, counsel extensively summarized the forensic evidence. *Id*. at 51-63.

In light of the above, trial counsel's strategy decisions throughout the trial were not unreasonable under *Strickland*, and trial counsel was not ineffective merely because that strategy was unsuccessful. *See Minigan v. Donnelly*, No. 01-CV-0026A, 2007 WL 542137, at *22-23 (W.D.N.Y. Feb. 16, 2007) (citing *People v. Benevento*, 674 N.Y.S.2d 629, 632 (1998) (a reviewing court "must avoid confusing true ineffectiveness with mere losing tactics . . . a simple disagreement with strategies, tactics or the scope of possible cross-examination, weighed long after trial, does not suffice"); *Jenkins v. Unger*, 03 cv 1172, 2007 WL 911889, at *6 (N.D.N.Y.

Mar. 22, 2007) (discussing reluctance to second-guess counsel's trial strategy simply because that strategy was unsuccessful).

### 2. Extreme Emotional Disturbance Defense

Petitioner argues trial counsel failed to present and/or preserve the extreme emotional disturbance defense. (Dkt. No. 1 at 16-17.) Petitioner contends, as he did in the § 440 motion to vacate judgment, that trial counsel was ineffective based upon his failure to: (1) comply with the County Court's Order to serve upon the People a proper notice of intention to offer psychiatric evidence and to disclose to the People medical records of Petitioner's psychiatric history; (2) consult any psychiatric or psychological expert or have such expert evaluate Petitioner relating to his psychiatric defenses of extreme emotional disturbance and "lack of specific intent," as well as trial counsel's decision not to serve a proper CPL § 250.10 notice; and (3) interview or call to testify potential defense witness who would have supported Petitioner's psychological defense he was suffering from extreme emotional disturbance and/or lacked specific intent at the time of the shootings. *Id.* Specifically, Petitioner argues trial counsel's performance, was "inherently unreasonable when made without the assistance of an expert to advise counsel about whether [Petitioner's] records and history supported or could be reconciled with such a defense." (Dkt. No. 28 at 37.)

Although the County Court cited New York law in rejecting Petitioner's ineffective assistance claims, it applied the reasoning of *Strickland* and found that Petitioner received effective assistance. (Dkt. No. 1-1 at 3-9.) Therefore, the state court's decision is entitled to AEDPA deference, and the Court concludes that it was neither contrary to nor an unreasonable application of *Strickland. See Rosario v. Ercole*, 601 F.3d 118, 128 (2d Cir. 2010) (provided

state-law decision applies the substantive tenets of *Strickland*, a state court "need not employ the language of a federal court's *de novo* review in order to pass AEDPA muster").

In its decision denying Petitioner's § 440.10 motion, the County Court found that trial counsel's failure to pursue a defense of extreme emotional disturbance, "even when considered in light of the additional evidence presented in the [440 motion], was not ineffective assistance of counsel." (Dkt. No. 17-3 at 5.) The Supreme Court has reiterated the requirement that federal courts use a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow* 134 S. Ct. 10, 13 (2013) (quoting *Pinholster*, 563 U.S. at 189). As set forth below, the County Court's decision was neither contrary to, nor an unreasonable application of, Supreme Court precedent.

"Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700. Thus, where the court can "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," the court should do so. *Strickland*, 466 U.S. at 697.

Here, as to *Strickland's* prejudice prong, these is no reasonable probability that the result of the proceeding would have differed absent counsel's alleged errors. On direct appeal, Petitioner argued the County Court's preclusion of the extreme emotional disturbance defense violated his right to due process and to present a defense. (Dkt. No. 14-1 at 41-49.) In rejecting that claim, the Appellate Division found, that "even if . . . County Court did not have an appropriate basis to preclude defendant from asserting this defense based on the existence of an [extreme emotional disturbance], [Petitioner] would not have been prejudiced because he has never established that the requite elements of such a defense in fact exist." *People v. Muller*, 899 N.Y.S.2d at 431. In that regard, the Appellate Division noted that Petitioner sought to:

offer testimony from lay witnesses, as well as medical records to establish that at the time of the shootings, he was suicidal and depressed. However, while expert testimony is not an essential prerequisite for establishing the existence of such a defense, [Petitioner] was still obligated to provide that a relevant connection existed between his claimed mental infirmity and his decision to shoot and kill two innocent people. Not only has [Petitioner] failed to state how he would establish that such a connection existed, but his task in that regard was made even more problematic by statements he made after the shooting but prior to his arrest, and sworn testimony he gave at trial, as well as arguments made on his behalf during the prosecution and on this appeal—all of which are manifestly inconsistent with the essential elements of this psychiatric defense.

*Id.* (internal citations omitted).

Accordingly, the County Court held that in order to "avoid the imposition of the mandatory bar pursuant to CPL § 440.10(2)(a), (c)," Petitioner needed to adduce "evidence outside the record such to demonstrate that trial counsel's failure to adequately present and/or preserve the [extreme emotional disturbance] defense visited prejudice upon him such to deprive him of a meaningful defense and a fair trial." (Dkt. No. 1-1 at 4.)

In support of his CPL § 440.10 motion, Petitioner submitted the October 4, 2001, report of Sanford L. Drob, Ph.D., (Dkt. No. 14-4 at 1-26), along with five affidavits from Petitioner's family and friends. (Dkt. No. 1-6 at 2-6; Dkt. No. 1-5 at 2-11.) According to Petitioner, Dr. Drob's report "demonstrates the myriad ways in which consultation with an expert would have assisted [Petitioner's] counsel in preparing and presenting [Petitioner's] psychological defenses of [extreme emotional disturbance] or lack of intent, including making a far more effective argument for admitting into evidence [Petitioner's] chronic and deteriorating depressive and suicidal thoughts and behavior occurring more than four days before the shooting." (Dkt. No. 28 at 35.) For example, Dr. Drob concluded that for three months leading up to the incident, Petitioner was undergoing "continued and recurring symptoms of a major depressive episode,

characterized by extreme emotional lability, suicidal thoughts, and impulsive destructive and particularly self-destructive behavior." *Id.* Dr. Drob further opined:

> [A] comprehensive evaluation of the defendant's mental state at the time of the alleged offense would have revealed that he was psychologically prone to loss of emotional and rational control, and that at the time of the incident he was in the midst of a catathymic event (i.e. an outburst of emotion resulting in impulsive, irrational and destructive behavior) in which he was overwhelmed by rage and despair which would have severely impaired his reason and judgment.

*Id.* at 35-36.

Thus, Petitioner argues that a psychological expert such as Dr. Drob "could have assisted counsel and his client to understand the effect of [Petitioner's] condition on his memory and might have assisted them in re-evaluating [Petitioner's] defense that the shootings were accidental." (Dkt. No. 28 at 36.) Dr. Drob further opined that "even if [Petitioner] had persisted in testifying that the incident was an accident and that he lacked any homicidal intent at any time,"

> expert testimony could have been elicited that, without directly undermining the defendant's narrative, explained to the jury that whether he arrived on the scene with the intent to commit suicide or homicide, and whether the homicide was accident or intentional, he was in the throes of a serve emotional episode in which his reason was overborn. This could have been relevant to an alternative defense of extreme emotional disturbance.

*Id.* at 37-38.

The County Court found that: "[i]n considering Dr. Drob's assertions of [Petitioner's] statements and trial testimony, it is apparent that those assertions fail to bridge the practical and legal chasm between [Petitioner's] purported mental state as it relates to traveling to and entering the home of the victims (but, as to the latter act, only doing so after disabling the home's telephone line), and the tenor of the events that actually transpired (as recounted by [Petitioner]

in statements and via his trial testimony), contemporaneous with the homicides." (Dkt. No. 1-1 at 7.) "In other words, while [Petitioner's] mental state is of some relevance with regard to what motivated him to enter [the Lynches' home], it is of no relevance to the shootings that followed; shootings that [Petitioner] has consistently maintained were accidental and, as such, insufficient to vest him with the *actus reus* and *mens rea* requisite to legally sustain a charge of murder in the first degree." *Id*.

Lastly, the County Court found Dr. Drob's statement that Petitioner "now acknowledges that he may have intentionally pulled the trigger of the firearm[,]" to be "decidedly self-serving," and "refuted by documentary evidence." *Id*. at 8.

While County Court found that the submissions "strengthened" Petitioner's assertion that he "suffered from depression and suicidal ideation at a time in close proximity to the shootings," Petitioner had "nevertheless failed to demonstrate how his mental state has any nexus to a shooting that he continually claimed, and ultimately testified, was accidental, or any relevance insofar as the *actus reas* and *mens rea* of the crime are concerned." *Id*. at 5. As the County Court found:

> Simply put, [Petitioner] has marshaled a great deal of evidence of a character of such continued irrelevance insofar as the *actus reus* and *mens rea* of the crime are concerned, that its exclusion at trial, either by order of the trial Court, or by reason of the conduct of [Petitioner's] trial counsel, visited no prejudice upon [Petitioner]. As such, trial counsel's failure to pursue that avenue of defense, even when that failure is considered in light of the additional evidence presented in the course of the [§ 440] motion, was not ineffective assistance of counsel.

*Id*.

In light of the above, Petitioner cannot demonstrate, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See*

*Strickland*, 466 U.S. at 693. Because Petitioner has failed to establish the "prejudice" prong of the *Strickland* test, there is no need for the Court to consider whether he has shown that counsel's performance was constitutionally deficient. *Id.* 466 at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

### 3. Failure to Call Witnesses

Petitioner also claims that counsel was constitutionally ineffective because he failed to interview and call witnesses who would have supported Petitioner's psychiatric defenses. In support of this claim, Petitioner submitted the affidavits of friend Kristen Hanley ("Hanley") and first cousin Melissa Thompson ("Thompson). (Dkt. No. 16-1 at 53-59.) According to Hanley, at trial she would have testified that on June 27, 2007, at approximately 10:00 p.m., she spoke with Petitioner on the telephone. *Id.* at 53. She would have testified that he was planning on killing himself in front of Christie. *Id.* In addition, according to Thompson, she would have testified that Petitioner was highly stressed for months before the incident, and that Petitioner called her on the telephone at approximately 9:30 p.m. on June 27, 2006, asking "do you know where to get a gun? You know People in Hudson, where can I get a gun?" *Id.* at 57.

An attorney's decision "whether to call specific witnesses--even ones that might offer exculpatory evidence--is ordinarily not viewed as a lapse in professional representation." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1986) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial."), *cert denied*, 484 U.S. 958 (1987); *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999). Indeed, "[t]here are countless ways to provide effective assistance in any given

case.  Even the best criminal defense attorneys would not defend a particular client in the same way."  *Strickland*, 466 U.S. at 689) (citation omitted).

Here, the purported testimony of Hanley and Thompson would not have exculpated Petitioner of the charges.  As the County Court found, "the uninformative nature of [Petitioner's] mental state is heightened when viewed in light of the fact that [Petitioner's] statements and testimony described accidental shootings that resulted from the inadvertent, unintentional, and involuntary discharge of the firearm in question caused by the action of one of the victims in grabbing the firearm and thereafter applying some manner of centrifugal force in the course of attempting secure the firearm from [Petitioner], such to cause [Petitioner's] finger to involuntary depress the firearm's trigger."  (Dkt. No. 1-1 at 7-8.)  While these potential witnesses might have supported Petitioner's defense in some part, Petitioner cannot demonstrate that *but for* the absence of their testimony, the result of the trial would have been different.  *See Strickland*, 466 U.S. at 694.

4.      *Voir Dire* and Summation

Petitioner also argues trial counsel was ineffective by (1) needlessly prompting a prospective juror to comment in open court that she had read in a newspaper that Petitioner confessed to the crime and (2) failing to object to the prosecutor's statement during summation that Petitioner had never before told anyone that he was suicidal at the time of the shooting and that the shooting was accidental.  (Dkt. No. 1 at 16.)  With respect to these claims, the County Court found that even though Petitioner's "trial counsel failed to object at certain points during the people's summation, and engaged in a colloquy with a potential juror during *voir dire* relative to [Petitioner's] purported confession, it remains that [Petitioner] was not entitled to 'perfect representation' but rather to that which he actually received in the instant case, a

competent and meaningful defense." *Id.* (internal citation omitted). The County Court further stated that both of these instances of alleged ineffectiveness "are on the record of the proceedings before this Court such that the denial of that branch of his motion is mandatory." *Id.* (citing CPL § 440.10(2)(c)).

Respondent contends these ineffective assistance claims are procedurally barred from habeas review, and in any event, meritless. (Dkt. No. 11 at 43-44.) However, under New York law, where "some of the defendant's allegations of ineffectiveness involve matters appearing on the record, while other involve matters that are outside the record, the defendant has presented a 'mixed claim' of ineffective assistance." *Pierotti v. Walsh*, ___ F.3d ____, No. 15-1944-pr, 2016 WL 4446018, at *6 (2d Cir. Aug. 24, 2016) (quoting *People v. Maxwell*, 933 N.Y.S.2d 386, 388 (2d Dep't 2011) (alteration omitted) (quoting *People v. Evans*, 925 N.Y.S.2d 366, 367 n.2 (2011))). "Where 'a defendant presents a mixed claim of ineffective assistance . . . , such a mixed claim, presented in a Section 440.10 motion, is not procedurally barred, and the Section 440.10 proceeding is the appropriate forum for reviewing the claim of ineffectiveness in its entirety.'" *Id.* (alteration in original, brackets omitted) (quoting *Maxwell*, 933 N.Y.S.2d at 388).

Here, the County Court applied New York's "meaningful representation" standard. (Dkt. No. 17-3 at 9.) This standard is equivalent to the first prong of the *Strickland* test. *See Rosario v. Ercole*, 601 F.3d 118, 124 (2d Cir. 2010) ("The first prong of the New York test is the same as the federal test; a defendant must show that his attorney's performance fell below an objective standard of reasonableness.") (citing *People v. Turner*, 806 N.Y.S.2d 154, 156 (2005)). As set forth above, with respect to the "other assertions" regarding trial court's alleged ineffective representation, including counsel's colloquy with a potential juror, the County Court found Petitioner received a "competent and meaningful defense." An attorney's actions during *voir*

*dire* are considered matters of trial strategy entitled to substantial deference in the application of the *Strickland* standards. *See, e.g.*, *Charlemagne v. Goord*, 05 Civ. 9890, 2008 WL 2971768, at *27 (S.D.N.Y. June 30, 2008), *adopted by*, 2011 WL 2150646 (S.D.N.Y. May 31, 2011); *Mills v. Lempke*, 11-CV-440, 2013 WL 435477, at *22 (W.D.N.Y. Feb. 4, 2013). Here, Petitioner has failed to overcome his burden of showing the County Court's rejection of this claim was contrary to nor an unreasonable application of Supreme Court precedent.

Nor was counsel ineffective in failing to object to the prosecutor's comments. As discussed *infra* in Section E., the prosecutor did not engage in misconduct when giving her summation. Therefore, Petitioner's trial counsel was not ineffective in not objecting to the prosecutor's summation. *See Lavayen v. Duncan*, 311 F. App'x 468, 470 (2d Cir. 2009) (refusing "to impose a constitutional obligation on defense counsel to object" when "the prosecutor's statement [was not] patently erroneous and prejudicial"). Therefore, the state court's decision on that claim did not unreasonably apply *Strickland*.

In light of the foregoing, the Court finds that the County Court's determination that Petitioner's Sixth Amendment right to effective assistance of counsel had not been violated was neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court. The Court recommends denying Petitioner's ineffective assistance of trial counsel claim.

### C.     Ground Three:  Ineffective Appellate Counsel

Petitioner argues his appellate counsel was ineffective for failing to raise on direct appeal that trial counsel was ineffective based on his conduct during *voir dire*. (Dkt. No. 1 at 16.) Petitioner raised this claim in a motion for a writ of error *coram nobis*. (Dkt. No. 18-1.) The Appellate Division rejected the motion on December 21, 2012 (Dkt. No. 18-2 at 2), and the

Court of Appeals denied leave to appeal on June 27, 2013 (Dkt. No. 18-3 at 2). *People v. Muller*, 971 N.Y.S.2d 258 (Table) (2013). This Court must defer to the state court's decision, and deny relief if there is any reasonable basis on which it can be found consistent with the governing precedent. *See Richter*, 562 U.S. at 102.

A claim of ineffective assistance of appellate counsel is reviewed under the same standard set forth in *Strickland. Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("[T]he proper standard for evaluating [petitioner's] claim that appellate counsel was ineffective in neglecting to file a merits brief is that enunciated in *Strickland*[.]; *Smith v. Murray*, 477 U.S. 527, 535-536 (1986) (applying *Strickland* to claim of appellate error); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Chrysler v. Guiney*, 806 F.3d 104, 117-118 (2d Cir. 2015).

To satisfy the rigorous *Strickland* standard when reviewing appellate counsel's performance, "it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." *Giraldi v. Bartlett*, 27 F. App'x 75, 77 (2d Cir. 2001) (quoting *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000)). Rather, a petitioner must show that appellate counsel's performance was "outside the wide range of professionally competent assistance," and that there is a "reasonable probability" that, but for the deficiency in performance, the outcome of the proceeding would have been different. *Id.* (quoting *Strickland*, 466 U.S. at 690). "[A] petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Clark*, 214 F.3d at 322 (2d Cir. 2000) (quoting *Mayo v. Henderson*, 13 F.d 528, 533 (2d Cir. 1994)).

Here, Petitioner argues that "[i]f the State is correct that [Petitioner] should have raised the *voir dire*-related ineffectiveness point on direct appeal, then appellate counsel's failure to do so was itself ineffective and entitled [Petitioner] to habeas relief on the denial of his Sixth and Fourteenth Amendment right to effective assistance of counsel on direct appeal." (Dkt. No. 28 at 53-54.) However, as set forth above, in the appellate context, "[c]ounsel is not obliged to advance every nonfrivolous argument that could be made." *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) (citing *Evitts*, 469 U.S. at 394). Rather, appellate counsel is permitted to focus on those that present "the most promising issues for review." *Jones v. Barnes*, 463 U.S. 745, 752-53 (1983).

Here, the record reflects that appellate counsel did just that. Appellate counsel submitted a thorough, well-researched sixty-page brief in which he persuasively argued five issues: (1) the County Court violated Petitioner's right to present evidence in his own defense by precluding him from raising the extreme emotional disturbance defense; (2) the County Court violated Petitioner's right of confrontation by curtailing his cross-examination of his estranged wife; (3) the County Court violated Petitioner's due process right to a fair trial by admitting Rupp's testimony; (4) the County Court violated Petitioner's due process right to a fair trial by refusing to compel the People to disclose recordings of Petitioner's telephone conversations used to impeach witnesses and to refresh recollections; and (5) in light of Petitioner's service as a police officer and volunteer firefighter, along with no prior criminal history, the sentence was excessive and harsh. (Dkt. No. 14-1.)

In support of the *coram nobis* petition, Petitioner submitted an affirmation of his appellate counsel, in which counsel affirms he reviewed the complete record on appeal, took careful notes on the materials, and made a list of potential issues. (Dkt. No. 18-1 at 22.) He

furthered stated he remembers this case well, yet had no recollection of noticing the *voir dire* excerpt or "realizing its significant." *Id*. Appellate counsel speculated that "the discussion of a 'confession' during *voir dire* might have left jurors with a misconception that at some point he confessed to intentional murder." *Id*. at 23.

In any event, appellate counsel likely recognized, as analyzed above, that there was no merit to an ineffective assistance of counsel claim. Indeed, trial counsel was a zealous advocate for Petitioner. Deficient performance requires a showing that counsel's performance fell below an objective standard of professional reasonableness. *Richter*, 562 U.S. at 104. "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Id*. (quoting *Strickland*, 466 U.S. at 687) (internal quotation marks and further citation omitted). As the County Court found, although trial counsel "engaged in a colloquy with a potential juror during *voir dire* relative to [Petitioner's] purported confession, it remains that [Petitioner]was not entitled to 'perfect representation' but rather to that which he actually received in the instant case, a competent and meaningful defense." (Dkt. No. 17-3 at 9 (internal citation omitted)). Because trial counsel's conduct during *voir dire* did not rise to the level of a Sixth Amendment violation, appellate counsel's failure to bring a meritless claim does not give rise to ineffective appellate counsel. *See, e.g.*, *Aparicio*, 269 F.3d at 99-100.

Petitioner has failed to show but for appellate counsel's failure to raise ineffective trial counsel claim based upon his colloquy with a potential juror during *voir dire*, there was a reasonable probability that the result would have been different. *See Strickland*, 466 U.S. at 694. In light of the above, the Appellate Division's decision rejecting this claim was not contrary to nor an unreasonable application of *Strickland*. The Court recommends denying Petitioner's ineffective assistance of appellate counsel claim.

**D.     Ground Four:  Cross-Examination**

Next, Petitioner claims, as he did on direct appeal, that the trial court's curtailment of his wife's cross-examination on the issues of her pecuniary interest in Petitioner's conviction, her refusal to allow defense representatives to view the crime scene, and her desire to see Petitioner convicted, deprived him of his right to a fair trial.  (Dkt. No. 1 at 17.)  Respondent argues this claim is without merit.  (Dkt. No. 11 at 40-43.)  The Court agrees.

A defendant's Sixth Amendment right to confront witnesses is guaranteed in both federal and state criminal proceedings.  *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986); *Pointer v. Texas*, 380 U.S. 400 (1965).  The right to cross-examination is not, however, absolute, and a trial court may place reasonable limits on a defense attorney's cross-examination of a prosecution witness "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Young v. McGinnis*, 411 F. Supp. 2d 278, 302 (E.D.N.Y. 2006) (quoting *Van Arsdall*, 475 U.S. at 679 (citations omitted)).  Indeed, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish."  *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original).

Petitioner alleges the County Court unconstitutionally limited his attorney's cross-examination of Christie Muller for bias.  (Dkt. No. 1 at 16.)  In rejecting this claim in the context of Petitioner's direct appeal, the Appellate Division held:

> We find no error in the restrictions placed by County Court on defendant's cross-examination of his estranged wife, or that its rulings in some way prevented defendant from establishing that his wife was hostile toward him or that this hostility might have in some way affected her trial testimony.  In this regard, we note that his wife was subjected to an extensive cross-examination at trial,

> which included questions regarding her relationship with another
> man and her request for equitable distribution of the parties' assets
> in a pending action for divorce.

*People v. Muller*, 899 N.Y.S.2d at 432.

This conclusion is supported by the record. As discussed in detail above, Petitioner's trial counsel cross-examined Christie Muller at length about the shootings. (Dkt. No. 20-1 at 84-150.) Counsel questioned Christie about filing for divorce, and elicited she had retained a lawyer who was advising her regarding her rights as to martial property and assets. *Id.* at 137, 141-45. Christie Muller testified that she was in a dating relationship with another man, and she invoked her right against self-incrimination when asked if she was having sexual relations with Travis Sanford while married to Petitioner. *Id.* at 138-39.

"[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, . . . confusion of the issues, . . . or interrogation that is repetitive or only marginally relevant." *United States v. Shvartsman*, 317 F. App'x 68, 70 (2d Cir. 2009) (citing *Van Arsdall*, 475 U.S. at 679). As the Appellate Division held in rejecting this claim on direct appeal, "[w]hile some limits were placed on counsel by the court it is simply inconceivable, given the attendant circumstances, that a juror would not recognize that his wife harbored an animus against defendant and would be hostile towards him[.]" *People v. Muller*, 899 N.Y.S.2d at 432 (internal citations omitted). Cross-examination is not improperly curtailed if "the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility." *United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir. 1990) (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir. 1980)); *see Howard v. Walker*, 406 F.3d 114, 129 (2d Cir. 2005); *see also Davis v. Alaska*, 415 U.S. 308, 318 (1974).

The County Court's decisions limiting discrete aspects of the cross-examination of Christie Muller, while still allowing Petitioner's trial counsel to raise issues relevant to credibility, did not rise to the level of constitutional error, and the Appellate Division's decision, which is entitled to AEDPA deference, was not contrary to nor an unreasonable application of clearly established Supreme Court precedent.  The Court recommends denying this claim.

**E.      Ground 5:  Prosecutorial Misconduct**

Lastly, Petitioner claims, as he did in his § 440.10 motion to vacate judgment, the People violated his right to due process by suppressing *Brady* materials, including statements by five witnesses confirming Petitioner's depression and suicidal ideation at the time of the crime, and by misleading the jury by arguing during summation that Petition recently fabricated his defense of accident.  (Dkt. No. 1 at 10, 17-18.)  As set forth above, the County Court denied Petitioner's § 440.10 motion for that relief (Dkt. No. 17-3 at 9-11), and the Appellate Division denied leave to appeal (Dkt. No. 1-2 at 2).

1.      Brady

A prosecutor has the duty under *Brady v. Maryland*, 373 U.S. 89 (1963) to produce evidence favorable to the defense.  To establish a *Brady* violation, "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir.1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  "The touchstone of materiality is a

reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as resulting in a verdict worthy of confidence." *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987).

In support of his *Brady* claim, Petitioner presented five statements the People failed to disclose before trial. (Dkt. No. 36-1 at 7- 25.) The victim impact statements of Kathleen Coddington and Caroline Zeyak, siblings of Carolynn Lynch and Dennis Lynch, respectively, revealed that Petitioner "often talked of suicide" and that Dennis Lynch was "concerned" Petitioner would "hurt himself." (Dkt. No. 36-1 at 20-25.) The statements of Kathy Kitchens, Kurt Kitchens, and Kyndra Wheeler (daughter of Kathy Kitchens), all of which were dated August 1, 2006, recounted a time in early June, 2006, when Petition visited their house in North Carolina for approximately two hours, during which time he expressed thoughts of depression and suicide. *Id.* at 7-18. Those statements were produced by Columbia County's Sherriff's Department in response to an October 25, 2010, Freedom of Information Law ("FOIL") request by Laura Muller, Petitioner's present wife. (Dkt. No. 16-1 at 60.)

Kyndra Wheeler's statement revealed that Petitioner stated he was "going to kill himself" and would "run his car off of a cliff or a bridge." (Dkt. No. 36-1 at 13.) Kyndra Wheeler also stated that Petitioner said "that if he didn't kill himself[,] he would kill somebody else." *Id.* at 14. According to Kurt Kitchens' statement, Petitioner was "extremely upset and distraught." *Id.* at 17. He also talked about "how Christie had him locked up in the psyc (sic) ward." *Id.*

Petitioner also mentioned that there had been an order of protection against him because Christie had said he had threatened her with a gun. *Id*. at 18. Kurt Kitchens asked Petitioner if he had any guns, and Petitioner responded, "well not that they know about and besides if I need a gun I can get a gun." *Id*.

In denying Petitioner's § 440.10 motion, County Court found that the above statements did not constitute *Brady* material. (Dkt. No. 17-3 at 10.) Specifically, County Court found the material "favorable to" Petitioner, but not "exculpatory" because the statements "merely buttressed [Petitioner's] claims that he suffered from emotional problems and experienced suicidal ideation; claims that the Appellate Division found so divorced, in a practical and legal sense, from his statements and testimony that the shootings were accidental, to render 'his assertion of such an affirmative defense inherently implausible.'" *Id*. (quoting *People v. Muller*, 899 N.Y.S.2d at 432).

As discussed above, the test of materiality established by the Supreme Court for purposes of determining *Brady* violations is "whether in [the] absence [of the undisclosed evidence the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. Here, the two victim impact statements that the Lynches had expressed their concern that Petitioner would commit suicide, and the statements of three individuals that Petitioner had discussed his thoughts of killing himself do not "undermine confidence in the outcome of the trial."

Indeed, as the County Court recognized, such statements may have bolstered Petitioner's claim of depression and suicide ideation, but in light of Petitioner's testimony that the shootings were accidental, the statements were not exculpatory. *See Leka*, 257 F.3d at 104 ("materiality is

assessed in light of the evidence adduced against the defendant at trial; when a conviction is supported by overwhelming evidence of guilt, habeas relief is not warranted.").

Further, the suppression of exculpatory evidence does not amount to a constitutional violation unless the evidence is material, *i.e.*, if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 681-82 (1985); *Boyette*, 246 F.3d 76 at 91 (citing *Bagley* ); *United States v. Carrington*, No. 02 CR. 897, 2002 WL 31496199, at *2 (S.D.N.Y. Nov. 7, 2002) ("[o]nly evidence that is material, as defined by the reasonable probability test set forth in *Bagley*, must be disclosed under *Brady*") (citations omitted).

In light of the above, the Court finds County Court's determination on the merits of Petitioner's *Brady* claim to be well supported by the evidence in the record and in accord with *Brady*. The Court recommends denying this claim.

### 2. Summation

Next, Petitioner argues that the People "compounded" the harm by arguing during summation that Petitioner "for the first time this week, [ten] months later, is the first time we hear that he went there to commit suicide. And an accident happened." (Dkt. No. 28 at 59; Dkt. No. 23-1 at 99). The County Court rejected this argument because it was refuted by documentary evidence: "the transcript reveals that the People were not referring to whether [Petitioner] experienced suicidal ideation generally, but rather as to whether [Petitioner] had revealed at any time prior to his trial testimony that he went to victims' home to commit suicide." (Dkt. No. 17-3 at 11.) Indeed, the prosecutor's full statement is as follows:

> Now, suicide, accident or something else. The Defendant admits
> in his own testimony that he still had the gun as he crossed the
> living room. He still had the gun, he was holding it in the kitchen.
> And he still was holding the gun in the driveway. If his story is to

be believed, that he were there to commit suicide in front of Christie, did he shoot himself in the living room? Did he shoot himself in the kitchen? Did he shoot himself in the driveway? He never did, did he? He never did shoot himself.

And he never told his cousin that he went there to commit suicide. In fact, for the first time this week, [ten] months later, is the first time we hear that he went there to commit suicide. And an accident happened.

(Dkt. No. 23-1 at 98-99.)

A petitioner may obtain habeas relief based on a claim of prosecutorial misconduct during summation only if the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). To meet his burden, Petitioner "must demonstrate that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994). Three factors are considered by a habeas court in determining whether a prosecutor's summation created actual prejudice: "'the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.'" *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998) (quoting *Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990) (quoting *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1982) (per curiam)).

Here, the record does not demonstrate prosecutorial misconduct; rather the prosecutor's comments were based on the evidence. As Respondent correctly points out, Petitioner did not tell Investigator Foster he went to the Lynches' home to commit suicide and the shooting was an accident. Petitioner told Foster "I need time to think." Petitioner did not tell his cousin that he went to the Lynches' house to commit suicide and the shooting was an accident. Petitioner did, however, tell LeClaire he went to the Lynches' house to speak with Christie and her parents and

he brought a weapon "to get their attention." Accordingly, the County Court's finding regarding the prosecutor's comment is supported by the record, and thus, the comment was not sufficiently egregious to infect the entire trial in violation of due process of law. Consequently, Petitioner was not deprived of a fair trial, nor was the verdict thereby rendered unworthy of confidence. *See Leka*, 257 F.3d at 104. The Court recommends denying this claim.

**WHEREFORE**, based on the foregoing, it is hereby

**RECOMMENDED**, that the petition for a writ of habeas corpus (Dkt. No.1) be **DENIED** and **DISMISSED**. The Court finds that Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) (2006) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000). Therefore, the Court recommends that no certificate of appealability issue with respect to any of Petitioner's claims.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.</u>** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b) (1); Fed. R. Civ. P. 72.


Dated: September 2, 2016
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge